# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Shari Lowes,

      Plaintiff,             :        **Case No. 2:18-cv-537**

      v.                      **Judge Sarah D. Morrison**
                              :        **Chief Magistrate Judge Deavers**

Dallas Baldwin,

      Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment. (ECF No. 36.) Plaintiff filed a Memorandum Contra to the Motion (ECF No. 47), and Defendant filed a Reply (ECF No. 48). The matter is now ripe for decision.

## I.     STATEMENT OF THE FACTS

Shari Lowes began working at the Franklin County Sheriff's Office ("FCSO") in 2004, and at the time of her termination on July 20, 2017, she worked as a deputy. (Shari Lowes Dep. 52:15–17, 55:6–10, ECF Nos. 28–29.) Defendant Dallas Baldwin was the Franklin County Sheriff at the time of Ms. Lowes's termination. (Amended Compl. ¶ 7, ECF No. 18; Lowes Dep. 263:10–15.)

Ms. Lowes has suffered from post-traumatic stress disorder ("PTSD") since December 2012, and she was formally diagnosed in winter 2013. (Lowes Dep. 42:6–12, 213:1–10.) While the severity of her illness has ebbed at times—to the point where she thought she might have been cured—Ms. Lowes's diagnosis was reaffirmed as recently as 2016. (*Id.* 96:13–97:25.) Ms. Lowes's PTSD caused her to have asthma and frequent migraines. (*Id.* 42:13–16; 108:19:23.) She also had a more difficult time dealing with stress than the average person. (*Id.* 98:25–99:5.)

For example, during stressful times, Ms. Lowes found it difficult to engage in daily activities, including taking a shower. (*Id.* 98:18–24.) She contends that her PTSD impeded her ability to come to work on occasion and that it may have impeded her ability to work at times, too. (*Id.* 119:11–24; Shari Lowes Aff. ¶ 4, ECF No. 47-3.)

In April 2013, Ms. Lowes requested and was granted permission to take intermittent leave pursuant to the Family and Medical Leave Act ("FMLA") for migraines and for stress/anxiety. (Lowes Dep. Ex. 10, ECF No. 30, at 1–7; *id.* Ex. 11, ECF No. 44-6.) Based on the information provided by Ms. Lowes's doctors, the FCSO allowed Ms. Lowes to take intermittent leave for one to two days at a time one to two times each week (for her stress/anxiety) or every two weeks (for her migraines). (*Id.* Ex. 10, 11.) Neither FMLA designation contained an expiration date. (*Id.*) In October 2013, Ms. Lowes requested and was granted permission to take intermittent FMLA leave for her PTSD one to two times per month for one to ten days at a time until January 18, 2014. (*Id.* 111:10–17; *id.* Ex. 12, ECF No. 30, at 8–17.) Ms. Lowes continued to use FMLA leave in the following years, including in 2016. (Annetta Rogers Aff. ¶ 4, ECF No. 36-2.)

Beginning in approximately 2015, Ms. Lowes worked the first shift at one of the FCSO jails. (Lowes Dep. 56:22–57:21.) In that position, Ms. Lowes was supervised by Corporal Joseph Brown, Corporal Melissa Ford, Sergeant Mandy Rennie, and Lieutenant Greg Goodrich. (*Id.* 58:12–20, 104:11–105:9.) Ms. Lowes sought to switch to the third shift, because she thought that making this change would be better for her PTSD. (*Id.* 57:9–13.) At some point in 2016, Ms. Lowes informed Corporals Brown and Ford that she had PTSD and that her current work assignment was exacerbating her condition, and she requested a different work assignment. (*Id.*

58:12–20, 104:7–105:20.) In response, Corporals Ford and Brown said that they would do what they could. (*Id.* 105:21–25.)

In February 2017, Ms. Lowes told Sergeant Rennie and Lieutenant Goodrich that she had PTSD, and she again requested a different work assignment. (*Id.* 65:5–14, 103:25–104:6.) Ms. Lowes ultimately received a different work assignment, although she believes that she was given a less desirable assignment and that she was given a different assignment not because of her PTSD but because she was disliked. (*Id.* 128:18–129:8, 179:15–180:22.)

A few months later, after a vacancy arose, Ms. Lowes applied and was hired for a position on the third shift. (*Id.* 65:15–23.) Ms. Lowes worked the third shift from spring 2017 until the time of her termination. (*Id.* 56:17–19, 64:8–9.) After moving to the third shift, Ms. Lowes told Sergeant Shelley Stonerook and Sergeant Deb Thompson, her new supervisors, that she had PTSD. (*Id.* 106:18–21.)

Based on Ms. Lowes's job description, her job as a deputy could only be carried out while physically present at the jail. (*Id.* Ex. 2, ECF No. 44-1.) Her job description said nothing about minimum attendance requirements, but it did require compliance with the FCSO rules and regulations. (*Id.*) Ms. Lowes understood that one of her job duties was that she had to come to work. (*Id.* 75:9–14.)

The FCSO has emphasized the importance of consistent attendance by its deputies. If there are not enough deputies on a shift, FCSO employees generally must work overtime by either staying late or coming in early. (*Id.* 73:19–25.) This has a negative impact on the safety of the facility as well as on jail administration and the budget. (Michael Flynn Aff. ¶ 5, ECF No. 36-1.) Sometimes supervisors were denied the ability to generate overtime, and a jail would need to operate understaffed. (Lowes Dep. 74:19–21.)

## A.     The FCSO's Leave Policies

During the relevant period of Ms. Lowes's employment all FCSO employees requesting leave were required to fill out a Request for Leave form (the "RFL"). (*Id.* 131:21–132:3; *id.* Ex. 13, ECF No. 44-7.) All RFLs were required to be submitted in advance of the time off, except for unforeseen sick leave. (*Id.* Ex. 13, at 1.) The RFL required that the employee requesting leave specify the type(s) of leave and number of hours requested. (*Id.* at 2.) All leave had to be approved by the employee's supervisors. (*Id.* at 3.)

The FCSO also had a policy specific to sick leave (the "Sick Leave Policy"). (*Id.* Ex. 14, ECF No. 30, at 20–25.) Pursuant to the Sick Leave Policy, an employee returning to work after being out sick was obligated to submit an RFL to request her leave retroactively. (*Id.* at 22.) Section 3.5 of the Sick Leave Policy said that an employee's "[a]ccrued sick leave" equaled the amount "reported on the most recent pay stub prior to the mark off less any subsequent leave use." (*Id.*)

The Sick Leave Policy stated that employees who requested sick leave but who did not have sufficient sick leave and "mark[ed] off sick for a condition that [did] not qualify under the FMLA" were "subject to discipline for sick leave abuse." (*Id.* at 23.) The Sick Leave Policy also provided that other leave could not be used in lieu of sick leave unless the employee took leave "for an FMLA approved condition" or received advance permission from the Sheriff. (*Id.*) The FCSO warned its employees that those with "a pattern of absenteeism [might] be subject to discipline up [to] and including removal . . . ." (*Id.* at 24.) The FCSO denies having a policy of allowing employees to use other types of leave in lieu of sick leave except for an FMLA-qualifying condition, as specified in the Sick Leave Policy. (Michael Flynn Dep. 159:16–23, ECF No. 46.)

The 2016–18 Collective Bargaining Agreement (the "FOP CBA") between the FCSO and the Fraternal Order of Police ("FOP"), Ms. Lowes's union, outlined additional rules governing sick leave for FCSO employees. (Lowes Dep. Ex. 15, at 62–64, ECF No. 31.) Specifically, the FOP CBA said that union members earned 4.6 hours of sick leave "for eighty (80) or more hours while on active pay status in a pay period." (*Id.* at 63.) This is in line with Ohio state law, which entitles county employees to 4.6 hours of sick leave "for each completed eighty hours of service." Ohio Rev. Code Ann. § 124.38 (West 2019). The FCSO contends that sick leave is not available for use until it appears on the paycheck—that is, until payroll is run for the period during which the sick leave was accrued. (Rogers Aff. ¶ 6.) Like the Sick Leave Policy, the FOP CBA also stated that other leave may not be used in lieu of sick leave unless the employee's reason for taking leave "qualifie[d] under the FMLA" or she received advance permission from the Sheriff. (Lowes Dep. Ex. 15, at 64.)

**B.      Shari Lowes's Disciplinary History**

Between August 2008 and December 2011, Ms. Lowes was disciplined six times for sick leave abuse for being absent without sufficient sick leave. (*Id.* Exs. 29–36, ECF No. 33, at 1–25.) In fall 2013, the FCSO notified Ms. Lowes that she was being disciplined for the seventh time for being absent without sufficient sick leave. (*Id.* Ex. 37, ECF No. 33, at 26.) On December 16, 2013, Ms. Lowes, the FOP, and the FCSO agreed to a Memorandum of Understanding whereby Ms. Lowes received a fifteen-day suspension; however, the parties agreed that Ms. Lowes would not need to serve the suspension as long as she was not subject to discipline for unauthorized absenteeism between October 6, 2013, and October 5, 2015. (ECF No. 33, at 29–30.)

Ms. Lowes failed to make it through this period without incurring another leave violation. In May 2014, she was notified of an eighth allegation that she had been absent without sufficient

sick leave. (Lowes Dep. Ex. 39, ECF No. 33, at 31.) In lieu of a suspension, Ms. Lowes, the

FCSO, and the FOP entered into a Last Chance Agreement on June 5, 2014 (the "LCA"). (*Id.* at

32.) Pursuant to the LCA, the parties agreed that "[i]f at any time before May 27, 2017, the

FCSO establishe[d] any future" sick leave abuse violations "occurring between May 27, 2014[,]

and May 27, 2017, Deputy Lowes [would] be subject to termination for said misconduct." (*Id.*)

The parties further agreed that the LCA would be extended "for any periods of leave in excess of

thirty (30) consecutive days including, but not limited to, vacation, sick, disability, injury and

Workers' Compensation leave." (*Id.*)

Around February 7, 2017, Ms. Lowes was notified that she was ineligible for leave under

the FMLA because she had worked less than 1,250 hours during the preceding twelve months.

(*Id.* 170:1–10; *id.* Ex. 16, ECF No. 32, at 1.) Ms. Lowes disagreed with this conclusion because

she claims that the time that she had to take off was not her fault. (*Id.* 170:11–19.) Ms. Lowes is

aware that one must be eligible under the FMLA to be able to take FMLA leave. (*Id.* 172:23–25.)

On April 12, 2017, Ms. Lowes submitted an RFL requesting sixteen hours of sick leave

after being out of work the prior two days. (Lowes Dep. Ex. 19, ECF No. 32, at 2.) On April 14,

2017, Ms. Lowes received her pay stub for the March 20, 2017, to April 2, 2017, pay period,

which showed her with a leave balance of 21.671 hours of sick leave. (Compl. Ex. 2, ECF No. 1,

at 20.) This leave balance did not account for the sixteen hours of leave that Ms. Lowes had

requested on April 12. (Lindsay Rasey Dep. 65:22–66:10, ECF No. 43.) Subtracting those hours

would have resulted in a balance of 5.671 hours.

On April 26, 2017, Ms. Lowes called off of her shift, which was scheduled to begin at

11:00 p.m., due to a migraine resulting from her PTSD. (Lowes Dep. 155:5–23, 353:4–15.)

When Ms. Lowes returned to work on her next scheduled work day, she submitted an RFL

requesting eight hours of sick leave for the shift that she missed on April 26. (*Id.* Ex. 42, at 11, ECF No. 44-12.) Ms. Lowes affirmed on the RFL that her absence was for an FMLA qualifying condition, although she did not specify the condition. (*Id.*) Ms. Lowes did not tell her supervisors or anyone in human resources that her absence was due to her PTSD until her disciplinary proceedings began. (*Id.* 157:21–158:18.) She is unaware whether anyone in human resources or payroll knew about the purpose of her absence. (*Id.* 234:18–235:4.)

Prior to requesting sick leave for her absence on April 26, Ms. Lowes consulted her pay stub from April 14, and based on the information on that pay stub and the fact that another pay period had since concluded on April 16, Ms. Lowes thought that she had sufficient leave. (*Id.* 201:16–23.) Ms. Lowes was under the belief that she earned her 4.6 hours of sick leave at the end of each pay period (i.e., after having worked eighty hours). (*Id.* 195:11–19, 202:2–8.) In other words, according to Ms. Lowes, she believed that she had earned an additional 4.6 hours of sick leave as of April 17 after the close of the April 16 period. Adding that to her prior leave balance of 5.671 hours would have resulted in a total leave balance of 10.271 hours.

The FCSO disagreed, maintaining that sick leave accrues as of the *pay date*. (Annetta Rogers Dep. 100:22–101:5, ECF No. 27.) The upshot of that would be that Ms. Lowes would not have accrued her next 4.6 hours of sick leave until her next pay date on April 28, 2017. (Rasey Dep. 41:23–43:9.) According to the FCSO, that meant that as of April 26, 2017, Ms. Lowes's total leave balance remained 5.671 hours. Accordingly, the payroll department determined that Ms. Lowes had insufficient leave (5.671 hours) to satisfy her RFL (eight hours) and marked her as "AWOL" for slightly over two hours. (ECF No. 33, at 34–35, 45.)

On June 28, 2017, Ms. Lowes and FOP representatives attended a pre-disciplinary meeting with representatives of the FCSO. (*Id.* at 35.) At this meeting, Ms. Lowes told the FCSO

that she would do anything to keep her job, and her union representative proposed an extension of the LCA in lieu of termination. (*Id.*)

When Ms. Lowes was asked when she had requested an accommodation rather than being marked AWOL, she responded with the following answers:

> I believe when I spoke with Lindsay [Rasey] in the preterm hearing, it was made very clear that I have PTSD and that's why I took that time off. At that point in time we should have put the brakes on and what you've done here should have been done then.

> [A]ctually on the eDocs when I put that it was an FMLA-approved condition. That's when there should have been something that should have been flagged to someone to say what's this about.

(*Id.* 168:24–169:4, 169:12–16.) Ms. Lowes made no other request for an accommodation. (*Id.* 173:16–175:25.) She blames the FCSO and her supervisors for failing to help her upon disclosure of her PTSD, or to ensure her well-being. (*Id.* 264:8–265:15, 266:9–23, 269:12–270:6, 399:22–400:16; Lowes Aff. ¶ 8.)

In a memorandum following the pre-disciplinary meeting, Lindsay Rasey, the Director of Human Resources, recommended that Sheriff Baldwin terminate Ms. Lowes due to the progressive disciplinary action taken against her and the LCA. (ECF No. 33, at 36.) On July 20, 2017, Sheriff Baldwin terminated Ms. Lowes. (*Id.* at 34.)

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the

nonmoving party to "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "summary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III. ANALYSIS

On May 2, 2019, Ms. Lowes filed an Amended Complaint with seven causes of action. (ECF No. 18.) Counts One through Three allege disability discrimination in violation of the Americans with Disabilities Act ("ADA") under a failure-to-accommodate theory of liability. (*Id.* at 6–7.) Counts Four through Six make identical claims under state law. (*Id.* at 8–9.) Count Seven is a breach of contract claim alleging that Sheriff Baldwin breached the terms of the LCA. (*Id.* at 10–14.)

### A. Breach of Contract Claim (Count Seven)

Sheriff Baldwin alleges that this Court lacks subject matter jurisdiction to adjudicate the breach of contract claim due to a provision in Ohio law stripping the judiciary of jurisdiction in matters closely related to CBAs. (Def. Mot. Summ. J., at 10–12, ECF No. 36.) Under Ohio law, the State Employee Relations Board ("SERB") has exclusive jurisdiction to decide matters under

Chapter 4117 of the Ohio Revised Code, which governs the collective bargaining of public employees. *Franklin Cty. Law Enf't Ass'n v. Fraternal Order of Police, Capital City Lodge No. 9*, 572 N.E.2d 87, 90 (Ohio 1991). Thus, Chapter 4117 strips the judiciary of jurisdiction over any state-law claims that are either founded on rights created by a CBA or that are dependent on analysis or interpretation of a CBA. *Holt v. Ohio*, No. C2-05-894, 2006 WL 8441982, at *8 (S.D. Ohio Sept. 27, 2006). Ms. Lowes argues that Chapter 4117 does not apply, and the Court addresses these arguments below. (Pl. Mem. Contra to Def. Mot. Summ. J., ECF No. 47, at 8– 14.) However, in crafting these arguments, Ms. Lowes cites no law on point, and all precedent of which this Court is aware supports the Sheriff's argument.

There are three Ohio District Court of Appeals decisions that address the salient issue of whether agreements that are collateral to a CBA remain governed by Chapter 4117. In *Bryant v. Witkosky*, the parties entered into a settlement agreement when the plaintiff filed a grievance after she was transferred. No. 2001-P-0047, 2002 WL 480078, at *1 (Ohio Ct. App. Mar. 29, 2002). The plaintiff was transferred back to her job, but upon realizing that her job assignments had changed, the plaintiff sued, alleging a breach of the settlement agreement. *Id.* The Eleventh District Court of Appeals was unable to find any state law on point and instead looked to "analogous federal case law" dealing with the Labor Management Relations Act ("LMRA"). *Id.* at *2. The court interpreted this case law to mean that when a settlement agreement is entered into to resolve a dispute covered under a CBA, that settlement agreement is also covered under the CBA. *Id.* at *3. The court explained as follows:

> We believe it was the intent of the Ohio State Legislature, when it drafted Chapter 4117, to keep these disputes between public employees and employers out of Ohio's courthouses. Labor disputes are best resolved through a grievance procedure which culminates in final and binding arbitration.
>
> . . . To hold otherwise would defeat the purposes of judicial economy and SERB. We would be forcing courts to strenuously and tediously inspect the various

provisions of collective bargaining agreements and settlement agreements, merely
to determine if they have subject-matter jurisdiction over a complaint. All
settlement agreements of this type are covered by the grievance procedure,
because the rights and relationships between the parties are created by the CBA,
and "if the asserted right is not directly created by the CBA, it would be the
product of an individual contract for employment, which is itself forbidden by the
CBA."

*Id.* at *3 (quoting *Jones v. Gen. Motors Corp.*, 939 F.2d 380, 384 (6th Cir. 1991)).

In *Bailey v. Beasley*, the Tenth District Court of Appeals came to a similar conclusion.

*See* No. 09AP-682, 2010 WL 1058748, at *5 (Ohio Ct. App. Mar. 23, 2010). After the plaintiff,

an employee of the Ohio Department of Transportation ("ODOT"), was terminated and filed a

grievance, he entered into a settlement agreement with his union and ODOT. *Id.* at *1. The

plaintiff subsequently sued ODOT for breach of contract, alleging a breach of the CBA. *Id.* at *2.

The court of appeals determined that the trial court lacked jurisdiction because the claim alleged

a breach of the CBA. *Id.* at *5. Although the court specifically found that the plaintiff's claim did

*not* allege a violation of the settlement agreement but rather only the CBA, the court stated that

even if the plaintiff's complaint *had* alleged a breach of the settlement agreement, the court

would still lack subject matter jurisdiction because a settlement agreement arising out of a CBA

would be subject to the same grievance procedure as the CBA itself. *Id.*

Most recently, in *Municipal Construction Equipment Operators' Labor Council v. City of

Cleveland*, the Eighth District Court of Appeals agreed. *See* 71 N.E.3d 655, 660 (Ohio Ct. App.

2016). The union plaintiff entered into a settlement agreement with the city of Cleveland to

reinstate some employees that the city had sought to fire. *Id.* at 657. When the city did not

reinstate the employees as agreed, the union sued for breach of the settlement agreement. *Id.* The

court upheld the trial court's dismissal of the complaint for lack of jurisdiction, finding that

although the plaintiff's claims arose from an alleged breach of the settlement agreement rather

than from the CBA itself, the claims were "certainly . . . dependent on the CBA and the rights created by it." *Id.* at 660.

Federal precedent regarding the LMRA is also instructive both because it is analogous to state collective bargaining and because of the *Bryant* court's reliance on this line of precedent. Under similar circumstances in the LMRA context, the Sixth Circuit Court of Appeals held that where a settlement agreement was arrived at through a grievance process established by a CBA, was signed by the parties engaged in collective bargaining, and dealt with a job whose terms and conditions are created by and subject to a CBA, a state law claim for breach of that settlement agreement was preempted by federal labor law. *See Jones*, 939 F.2d at 382–83. The Court reasoned as follows:

> [T]he settlement agreement itself is a creature wholly begotten by the CBA. The job from which Jones was fired and to which he seeks reinstatement exists solely by virtue of the CBA. The settlement agreement was the settlement of a grievance filed on Jones's behalf by the union pursuant to the dispute resolution procedures of the CBA. The parties agreeing to the settlement were GM and Jones's collective bargaining representative, the UAW. These parties have the power to determine Jones's right to employment at his job with GM solely by virtue of the LMRA and the CBA the two parties signed. Both the right Jones wants vindicated and the relationship between the parties embodied in the settlement agreement exist because of the CBA. In fact, if the asserted right itself is not directly created by the CBA, it would be the product of an individual contract for employment, which is itself forbidden by the CBA. Jones's claim is the archetype of a state-law claim that by its very nature involves an examination of the employment relationship of parties to a CBA, and is therefore pre-empted.

*Id.* at 383.

Although the Ohio Supreme Court has remained silent on whether agreements that are collateral to a CBA remain governed by Chapter 4117, this Court is duty-bound to anticipate how the Ohio Supreme Court would rule were it confronted with the issue. *See Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281, 289 (6th Cir. 2015). In doing so, the Court looks to the District Courts of Appeals, and while their decisions are not precedential, they are persuasive

unless the Court has reason to believe that the Ohio Supreme Court would disagree with them. *See id.*

The Court finds it persuasive that the only intermediate Ohio appellate courts to have addressed this issue all agree that the courts lack jurisdiction to adjudicate a dispute arising from an agreement that is collateral to a CBA. The Court also finds it persuasive that the Sixth Circuit's interpretation of federal law (which the Eleventh District Court of Appeals found persuasive in *Bryant*) is consistent with these three state court decisions. It is also significant that although the Ohio Supreme Court has not considered this issue, it favorably cited *Bryant* in concluding that the courts lack jurisdiction to consider a claim of an unfair labor practice. *See State ex rel. Wilkinson v. Reed*, 789 N.E.2d 203, 208 (Ohio 2003) (per curiam). The Court is persuaded that the Ohio Supreme Court would conclude that the judiciary does not have jurisdiction to adjudicate a breach of contract claim stemming from an LCA that is collateral to a CBA.

In support of jurisdiction, Ms. Lowes relies on five arguments—her discipline was based on state law and the LCA, not the FOP CBA; the LCA is a separate contract from the FOP CBA; it is not necessary to analyze the FOP CBA to determine whether she violated the LCA; the civil rights protected by the ADA exist independently of any rights created by the FOP CBA; and the LCA was itself discriminatory and violative of the ADA. The first three of these arguments serve to highlight that the LCA and FOP CBA are distinct, but that is not the issue. The issue is whether, to use the words of *Jones*, the LCA "is a creature wholly begotten by the [FOP] CBA." *See* 939 F.2d at 383.

The circumstances surrounding the LCA nearly parallel those surrounding the settlement agreement in *Jones*. Ms. Lowes's job "exists solely by virtue of the [FOP] CBA." *See id.*

Although the LCA did not result from the settlement of a grievance as in *Jones*, it does specifically waive Ms. Lowes's and the FOP's "right to grieve, arbitrate, or otherwise challenge this resolution and disposition of the charges . . . ." (ECF No. 33, at 32.) The parties agreeing to the settlement were Ms. Lowes, her employer, and her union. These parties had the power to determine Ms. Lowes's right to employment "solely by virtue of" Ohio law and the FOP CBA. And both the right Ms. Lowes wanted vindicated (i.e., her continued employment) and the relationship among the parties embodied in the LCA exist solely because of the FOP CBA. Like the settlement agreement in *Jones*, the LCA is a "a creature wholly begotten by the CBA," so Chapter 4117 precludes this Court from exercising jurisdiction over a claim alleging a breach of the LCA.

Ms. Lowes's remaining two arguments are not germane to her breach of contract claim. They deal with alleged violations of state and federal disability law, and nobody disputes the Court's jurisdiction over these claims. Although one of Ms. Lowes's theories of liability on her breach of contract claim is based on her contention that a particular provision of the LCA is void as against public policy, the Court would still lack jurisdiction to review the Sheriff's compliance with the LCA even if the Court were to agree that this provision was void. As a result, any ruling on the validity of this provision would be nothing more than an advisory opinion, which the Court lacks jurisdiction to issue. *See Wheeler v. City of Lansing*, 660 F.3d 931, 940 (6th Cir. 2011) (noting Article III's prohibition against issuing advisory opinions).

Lastly, in support of her arguments, Ms. Lowes relies on two cases, both of which are inapposite. The first, *Gilbert v. Correction Reception Center*, dealt with unfair labor practices, not collateral agreements, and it only addressed the jurisdiction of SERB. *See* No. 2:07-CV-624, 2008 WL 4347231, at *7 (S.D. Ohio Sept. 19, 2008). It did not address the issue of whether

Chapter 4117 divested the judiciary of jurisdiction over state law claims. *See id.* The second, *Roy v. Ford Motor Company*, was based on Michigan law and federal law, it dealt with the issue of federal question jurisdiction (and thus whether the *federal* courts had jurisdiction, as opposed to *any* courts at all), and the contract at issue was based on the plaintiff's individual employment contract rather than a CBA. *See* 748 F. Supp. 492, 494–95, 498 (E.D. Mich. 1990). Both of these cases are factually dissimilar and beside the point.

Although the Sheriff has sought summary judgment on this claim, a lack of jurisdiction means this Court has no authority to determine summary judgment, which would be a ruling on the merits. *See, e.g., Freeland v. Liberty Mut. Fire Ins. Co.*, 632 F.3d 250, 255 (6th Cir. 2011) (vacating district court's grant of summary judgment and remanding with instructions to remand to state court for lack of subject matter jurisdiction); *Valinski v. Detroit Edison*, 197 F. App'x 403, 403–04 (6th Cir. 2006) ("Since the district court and this Court are without authority to consider the merits of the case, the district court's decision on the merits must be vacated . . . .").

Accordingly, the Sheriff's Motion for Summary Judgment as to Count Seven is **DENIED** as moot, and Count Seven is **DISMISSED** without prejudice due to lack of subject matter jurisdiction.

### B.      Failure to Accommodate Claims (Counts One through Six)

To establish a *prima facie* failure-to-accommodate claim under the ADA, the plaintiff must prove 1) a disability within the meaning of the ADA; 2) she was otherwise qualified for her position, with or without reasonable accommodation; 3) her employer knew or had reason to know that she was disabled; 4) she requested an accommodation for her disability; and 5) her employer failed to provide the necessary accommodation. *Hunt v. Monro Muffler Brake, Inc.*, 769 F. App'x 253, 258 (6th Cir. 2019); *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839

(6th Cir. 2018). The parties agree that these five elements must be proven to establish a failure-to-accommodate claim. (ECF No. 36, at 14; ECF No. 47, at 15.) Failure-to-accommodate claims "'necessarily involve direct evidence (the failure to accommodate) of discrimination.'" *Brumley*, 909 F.3d at 839 (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)). As a result, once the plaintiff makes out a *prima facie* case, "the employer bears the burden 'of proving that . . . a proposed accommodation will impose an undue hardship upon the employer.'" *Id.* (alteration in original) (quoting *Kleiber*, 485 F.3d at 869).

A failure-to-accommodate claim under Ohio law is identical to such a claim under federal law. *Myers v. Cuyahoga Cty.*, 182 F. App'x 510, 515 (6th Cir. 2006); *see Stewart v. Bear Mgmt.*, 98 N.E.3d 900, 905 (Ohio Ct. App. 2017) (identifying identical elements). Neither party argues otherwise. The Court thus treats the federal and Ohio claims as coextensive.

Ms. Lowes has sought to pursue three theories of liability on her failure to accommodate claims—that the Sheriff refused to permit her to use other leave time in lieu of her sick leave (Counts One and Four), failed to properly account for her sick leave (Counts Two and Five), and improperly extended her LCA due to Ms. Lowes's extended absences during the LCA period (Counts Three and Six).

The Sheriff argues that Ms. Lowes has failed to establish any of the five elements as to any of her claims. (ECF No. 36, at 14.) In the Court's view, based on the record, the most salient elements are whether Ms. Lowes was otherwise qualified for her position (the second element) and whether she requested an accommodation (the fourth). Because the Court finds that Ms. Lowes was not otherwise qualified for her position and that she did not request an accommodation as required by the law, the Court finds it unnecessary to address the other three elements.

### 1.      The "otherwise qualified" element

"[A]n individual is 'otherwise qualified' if he or she can perform the 'essential functions' of the job with or without reasonable accommodation." *Keith v. Cty. of Oakland*, 703 F.3d 918, 925 (6th Cir. 2013) (quoting 42 U.S.C. § 12111(8) (2018)). A job function is essential if removing it would fundamentally alter the position. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854 (6th Cir. 2018). "[E]ssential functions are the core job duties, not the marginal ones." *Id.* They "generally are those that the employer's judgment and written job description prior to litigation deem essential." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 761–62 (6th Cir. 2015) (en banc) (internal quotation marks omitted). While the employer's judgment is given some weight, it is less important when an employee offers competing evidence. *Hostettler*, 895 F.3d at 855.

Regular and predictable on-site attendance is an essential function of most jobs. *See Ford*, 782 F.3d at 762–63. "'[I]n most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability. The fact is that in most cases, attendance at the job site is a basic requirement of most jobs.'" *EEOC v. Yellow Freight Sys.*, 253 F.3d 943, 948 (7th Cir. 2001) (en banc) (quoting *Waggoner v. Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999)); *see also Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418–20 (6th Cir. 2004) (finding plaintiff not qualified to perform the essential functions of his job as a pharmacy technician due to excessive absenteeism); *Tyndall v. Nat'l Educ. Ctrs., Inc. of Calif.*, 31 F.3d 209, 213 (4th Cir. 1994) ("[R]egardless of the fact that she possessed the necessary teaching skills and performed well when she was at work, Tyndall's frequent absences rendered her unable to function effectively as a teacher.").

The EEOC's regulations identify seven specific, but not exclusive, types of evidence of whether a particular function is essential—1) the employer's judgment, 2) written job

descriptions, 3) the amount of time spent on the job performing the function, 4) the consequences of not requiring the function, 5) the terms of a CBA, 6) the work experience of past employees in the job, and 7) the current work experience of those in similar jobs. 29 C.F.R. § 1630.2(n)(3) (2019). Generally speaking, each of these criteria "point toward finding regular and predictable on-site attendance essential" for most jobs, especially the interactive ones. *Ford*, 782 F.3d at 762.

The same remains true in the specific case of Ms. Lowes. First, the Sheriff has emphasized the importance of regular and predictable on-site attendance. When an FCSO deputy calls off of his or her shift, it must be the case that the jail is short-staffed, a deputy from an earlier shift will stay late, or a deputy from a later shift will come in early. If the jail is short-staffed, that has obvious implications for the safety and security of the facility, its employees, and the inmates. And deputies who must stay late or come in early earn overtime, which has a deleterious effect on the FCSO's budget. The burden on the employer of increasing employees' workloads and the employer's payroll expenses are important factors in whether an employee's excessive absenteeism renders her unqualified for a position. *See Brenneman*, 366 F.3d at 420 (affirming summary judgment for defendant where plaintiff's excessive absences increased employees' workloads and the Pharmacy Department's payroll expenses and decreased morale). Ms. Lowes has offered no evidence to contravene the Sheriff's judgment that regular and predictable on-site attendance is paramount.

Second, although Ms. Lowes's job description does not explicitly say that regular and predictable attendance is required, it is obvious that the required duties (e.g., maintaining security and discipline of the inmates, watching security screens, patrolling the floor) can only be completed when physically present in the facility. (*See* Lowes Dep. Ex. 2.) Moreover, the job description specifies that a deputy must be knowledgeable of FCSO rules and regulations. (*Id.*)

The FCSO's leave policy in general and Sick Leave Policy in particular are carefully crafted with the expectation of regular and predictable attendance, and deputies are expected to be knowledgeable of these policies and to abide by them. The Sick Leave Policy explicitly warns deputies that using unaccrued sick leave constitutes sick leave abuse and may result in discipline.

Third, in order to perform her duties, a deputy must be physically at the jail, and these duties would be severely disrupted were deputies habitually and erratically absent. Fourth, the consequences of not requiring regular and predictable attendance would severely hinder the Sheriff's ability to maintain safety and security in his facilities and would also have a deleterious effect on his budget. Fifth, the FOP CBA explicitly spells out the rules and expectations governing sick leave.

Ms. Lowes does not offer evidence to dispute any of these first five factors. Instead, she only offers evidence as to factor six—disparate treatment of former FCSO employees. Specifically, Ms. Lowes argues that she was treated less favorably than a former deputy, Stoney Confer. (ECF No. 47, at 19.) However, based on the evidence provided by Ms. Lowes, her situation is not comparable to Ms. Confer's. Ms. Lowes was disciplined eight times for being absent without sufficient sick leave before entering into the LCA, and on the ninth time, after the FCSO determined that she had violated the LCA, she was terminated. Based on the evidence that Ms. Lowes has provided, Ms. Confer was disciplined only three times for sick leave abuse and never entered into an LCA. (ECF Nos. 44-10, 47-1, 47-2.) In fact, it does not appear that Ms. Confer was ever even suspended, whereas Ms. Lowes was suspended multiple times before finally being terminated. It is also significant that Ms. Lowes's eighth and ninth policy violations occurred while she was on what was effectively probation for her seventh and eighth policy violations, respectively.

Because Ms. Lowes was given *significantly* more chances than Ms. Confer, Ms. Confer is not an adequate comparator. There is no evidence that the work experience of past or current FCSO employees demonstrates that regular and predictable on-site attendance is not an essential function for an FCSO deputy. Accordingly, the Court finds, based on the evidence, that regular and predictable attendance is an essential function of an FCSO deputy.

Despite multiple chances to conform her conduct, Ms. Lowes's failure to regularly and predictably show up for work provided a sufficient basis for Sheriff Baldwin to determine that she could not perform this essential function of her job. Ms. Lowes was disciplined eight times for nearly identical conduct before being explicitly told that she had one more chance. One would expect that after being disciplined eight times for taking more hours of sick leave than she had that Ms. Lowes would have been particularly prudent in ensuring that she was not going outside the bounds of the FCSO's Sick Leave Policy. Indeed, for nearly three years she was able to conform her conduct to the policy. However, the FCSO determined that Ms. Lowes violated the Sick Leave Policy a ninth time, and, pursuant to the LCA, this was her last chance.

Ms. Lowes's final argument that is relevant to the "otherwise qualified" element is that the Sheriff failed to engage in the interactive process required by the ADA. (ECF No. 47, at 7.) But an employer is not required to engage in the interactive process where an employee cannot perform the essential functions of her job. *See Ford*, 782 F.3d at 766. Based on the uncontested facts, Ms. Lowes was not "otherwise qualified" to be an FCSO deputy as a matter of law.

2.      **The "request for accommodation" element**

An "employer is not required to speculate as to the extent of [an] employee's disability or the employee's need or desire for an accommodation." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046–47 (6th Cir. 1998). Nor is it the employer's obligation to propose an

accommodation—the employee must affirmatively request one. *Cady v. Remington Arms Co.*, 665 F. App'x 413, 418 (6th Cir. 2016); 29 C.F.R. pt. 1630 App. § 1630.9 (2016) ("[I]t is the responsibility of the individual with a disability to inform the employer that an accommodation is needed."). This is "because many disabled people do not need an accommodation, and the employee is in the best position to know how the disability impacts their work. Furthermore, the ADA generally prohibits employers from inquiring about a disability's severity." *Cady*, 665 F. App'x at 418. Only once a disabled employee has requested the reasonable accommodation does the employer have the duty to make a reasonable effort to accommodate that employee. *Gantt*, 143 F.3d at 1046–47; 29 C.F.R. pt. 1630 App. § 1630.9 ("Once an individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation.").

There is "no bright-line test for when the form of an employee's request is sufficiently clear to constitute a request for an accommodation." *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 407 (6th Cir. 2014). It is not the case that an employee must "use the magic words 'accommodation' or even 'disability.'" *Id.* (internal quotation marks omitted). However, the employee must "make it clear both that he is making a request and that he is doing so *because of* his disability." *Waggoner v. Carlex Glass Am., LLC*, 682 F. App'x 412, 416 (6th Cir. 2017) (emphasis added) (internal quotation marks omitted); *see Brenneman*, 366 F.3d at 418 n.4 ("While plaintiff claimed that he would often [tell his employer that he was 'ill' or 'not feeling well'] when he was experiencing diabetes- related illnesses, this statement would not have reasonably apprised defendant that the absences were related to a disability rather than some general illness."). "Where, as here, 'the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, as is often the case when

mental disabilities are involved, the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations.'" *Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466, 470 (8th Cir. 2007) (alteration in original) (emphasis deleted) (quoting *Wallin v. Minn. Dep't of Corrs.*, 153 F.3d 681, 689 (8th Cir. 1998)); *see also Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 658 (6th Cir. 2016) ("[I]n requesting an accommodation, we require plaintiffs not only to request to be accommodated, but to also provide their employers with a sufficient basis to understand that the request is being made because of their disability.").

Ms. Lowes claims that she made two requests for accommodation. First, when she submitted her RFL, she stated that she was submitting leave for an FMLA-approved condition. Second, at the pre-termination hearing, Ms. Lowes told Human Resources Director Rasey that she had taken leave because of her PTSD. Ms. Lowes contends that either of these should have put the FCSO on notice that she was requesting an accommodation.

However, neither is sufficiently clear to constitute a request for an accommodation. There is no indication from either statement—even when taken together—that Ms. Lowes's PTSD was a disability and not just an illness, that this asserted disability resulted in her having particular limitations, or that she was requesting any sort of accommodation. At most, she provided a *reason* for her absence and her violation of the leave policy, not a request for an *accommodation* for a disability that caused her absence and her violation of the policy. Moreover, in expressing her willingness to do anything to avoid termination, it seems that if Ms. Lowes requested any accommodation at all, she requested an accommodation for her malfeasance, not a disability.

Ms. Lowes's gripes about the FCSO and her supervisors are also illustrative in this regard. Her primary complaint was that the FCSO and her supervisors had failed to help her or to

ensure her well-being. This shows that Ms. Lowes failed to understand that it was her obligation to ask for help. It was not the obligation of the FCSO to affirmatively offer her assistance.

No reasonable person could find that Ms. Lowes provided her employer "with a sufficient basis to understand that [her] request[s] [were] being made because of [her] disability." *See Deister*, 647 F. App'x at 657–58 (holding that plaintiff's requests that defendant review his medical records and meet with him to discuss employment conditions or to discuss being placed in a new position were insufficient to amount to requests for accommodation); *Rask*, 509 F.3d at 470 (finding plaintiff's notification to her employer that she was having problems with her medication and "might miss a day here and there" insufficiently specific to constitute a request for a reasonable accommodation). Her statements to the FCSO were vague and not sufficiently explanatory. Nor can Ms. Lowes rely on her earlier leave requests, such as her FMLA designations. For one, these documents are only evidence that Ms. Lowes was *sick*, not that she was *disabled*. *See Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008) ("'The ADA is not a general protection for medically afflicted persons.'" (quoting *Nese v. Julian Nordic Constr. Co.*, 405 F.3d 638, 641 (7th Cir. 2005))); *Ebright v. City of Pickerington*, No. 2:16-CV-378, 2018 WL 1512280, at *8 (S.D. Ohio Mar. 27, 2018) ("[W]hile a condition may make an individual eligible for FMLA leave, it may not render him or her disabled."). For another, FMLA designations in 2013 are insufficiently contemporaneous to qualify as a request for reasonable accommodation in 2017. *Cf. Aldini v. Kroger Co. of Mich.*, 628 F. App'x 347, 351 (6th Cir. 2015) (holding that plaintiff's submission of a doctor's note requiring restrictions on his work was insufficient to constitute a request for reasonable accommodation when he followed up with another note clearing him to work without restrictions and requested no additional accommodation for the next two years).

While the Sixth Circuit's precedents are decidedly in the Sheriff's favor, there are two cases in particular that are illustrative. First, in *Stanciel v. Donahoe*, the plaintiff, Milton Stanciel, had habitual attendance problems, and his supervisor continuously helped him avoid discipline including by letting him use annual leave to cover the time that he missed when he was tardy. 570 F. App'x 578, 579 (6th Cir. 2014). Nevertheless, Mr. Stanciel was disciplined after he was absent without leave on several occasions. *Id.* at 579–80. Finally, the defendant terminated him, and Mr. Stanciel sued for a failure to accommodate his mental disability. *Id.* at 580. Mr. Stanciel argued that he had requested various accommodations including by requesting a revised work schedule and by making a blanket, permanent request for reasonable accommodations when he certified his disability upon being hired. *Id.* at 583.

The Sixth Circuit found that the request for a revised work schedule was insufficiently specific because he never told the defendant that he was making this request because of his disability. *Id.* Accordingly, the defendant would have had no reason to know that this was a request for accommodation under the statute at issue.[1] *Id.* As for the supposed blanket request for accommodation, the court found that the plaintiff's certification of disability could not reasonably be read as a perpetual request for accommodation. *Id.* at 584.

More recently, in *Waggoner v. Carlex Glass America, LLC*, after the plaintiff, Michael Waggoner, was suspended for two violent outbursts towards his coworkers, he notified human resources that he had bipolar disorder. 682 F. App'x at 414. Mr. Waggoner was subsequently permitted to return to work if he agreed to seek treatment and consented to a last chance

---

[1] The plaintiff in *Stanciel* brought his claim under the Rehabilitation Act. *Id.* at 580–81. However, the standards "are largely the same" as under the ADA, and "cases construing one statute are instructive in construing the other." *Andrews v. Ohio*, 104 F.3d 803, 807 (6th Cir. 1997); *see also Smith v. Henderson*, 376 F.3d 529, 534 (6th Cir. 2014) (finding that EEOC's regulations pursuant to the ADA set forth the relevant legal standards for Rehabilitation Act claims).

agreement. *Id.* After returning to work, Mr. Waggoner was denied a transfer to two open positions in other departments even though he complained about some of the people with whom he worked. *Id.* Mr. Waggoner subsequently had another outburst and was fired. *Id.* After bringing suit, Mr. Waggoner argued that he should have had his disability accommodated by being transferred to another department. *Id.* at 416. Specifically, he argued that informing his employer about his disability and complaining about some of his coworkers should have put his employer on notice that his applications to transfer for the other open positions were for medical reasons, even though he had not specified that that was the case. *Id.*

The Sixth Circuit held that Mr. Waggoner had failed to request an accommodation because the connection between his request and his bipolar disorder was not clear. *Id.* Mr. Waggoner never said that he applied for the transfer to avoid coworkers who might trigger his bipolar disorder, and from his employer's perspective, there were other possible reasons why he might have applied for the transfer. *Id.*

Even when aggregating all of the information that she ever provided to the FCSO, Ms. Lowes has only provided evidence that she told the FCSO that she had PTSD, that she needed to take leave as a result, and that she would do anything to keep her job. These are analogous to the vague and fragmentary pieces of information that Mr. Waggoner provided to his employer. Just as the employer in *Waggoner* was not expected to piece together these random bits of information in order to puzzle together the complete picture, the FCSO was not either.

The comparison with *Stanciel* is even starker. There, Mr. Stanciel affirmatively requested alterations to his work schedule, and his supervisor even sometimes accommodated him by allowing him to use annual leave when he was late to work. Here, Ms. Lowes presents no evidence that she was ever granted such an allowance, and her vague request to keep her job was

even less specific than Mr. Stanciel's request for an alternative schedule. Moreover, like Mr. Stanciel, Ms. Lowes never linked her vague request to any asserted disability. She never provided the Sheriff with enough information to allow the Sheriff to make a decision about whether to grant her a reasonable accommodation.

While this all may seem exceedingly technical, it is not. The "request for accommodation" element exists to prevent a failure-to-accommodate claim from becoming a "gotcha" for an unsuspecting employer. "The point of requiring an employee to provide this kind of information is to allow the employer to understand that the employee suffers from a disability. Without this information the employer is unable to engage in the interactive process required to determine what accommodations might be appropriate and available." *Rask*, 509 F.3d at 470. The ADA is not a trap for the unwary. It is not the case that an employee can provide sparse information to her employer, expect the employer to fill in the blanks, and sue when she thinks the employer has come up short.

The dangers of such an approach are exemplified in Ms. Lowes's Opposition to the Sheriff's Motion for Summary Judgment. Ms. Lowes criticizes the Sheriff for failing to engage in the interactive process when the Sheriff did not have sufficient information to be aware of his duty to do so. An employer's "failure to engage in the interactive process is only an independent violation of the ADA if the plaintiff establishes a prima facie showing that he proposed a reasonable accommodation." *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014). Accordingly, if an "employee never requests an accommodation, the employer's duty to engage in the interactive process is never triggered." *Melange v. City of Ctr. Line*, 482 F. App'x 81, 85 (6th Cir. 2012). Thus, the fault lies with Ms. Lowes, not with the Sheriff. *See Breitfelder v. Leis*, 151 F. App'x 379, 385 (6th Cir. 2005) (concluding that because the plaintiff failed to propose an

objectively reasonable accommodation he bore "a significant amount of responsibility" for any breakdown in the interactive process that might have occurred).

Ms. Lowes identifies three specific theories of liability on her failure-to-accommodate claims, but she has not provided any evidence that she ever requested any of these supposed accommodations prior to commencing this litigation. First, she faults the Sheriff for refusing to permit her to use other leave time in lieu of her sick leave but she offers no evidence that she sought to do so. She blames the Sheriff for not *sua sponte* offering it to her, but it was *her* duty to request the accommodation, not the Sheriff's to offer it. *See Cady*, 665 F. App'x at 418. Second, Ms. Lowes accuses the Sheriff of improperly extending the LCA due to her extended absences, but she offers no evidence that she ever objected to this or that she ever requested that the LCA not be extended.

Third, she alleges that the Sheriff failed to properly account for her sick leave. However, she fails to tie this allegedly incorrect calculation to any sufficiently specific accommodation request that she made, and she is also factually incorrect. Specifically, Ms. Lowes relies on three aspects of the FCSO's policies to argue that the Sheriff's office failed to accommodate her asserted disability. She is factually wrong as to each, although it is worth noting that Ms. Lowes's allegations that the Sheriff breached his policies do not fit comfortably within her failure-to-accommodate claims of disability discrimination. This is because Ms. Lowes offers no evidence that she challenged the Sheriff's reading of the policies or even that she requested a different interpretation of the policies (i.e., she failed to request an accommodation). Nor does she offer any evidence that the Sheriff's interpretations of the policies were in any way related to her asserted disability (e.g., that the policies were applied unevenly as between those with and without disabilities). To the extent that Ms. Lowes argues that the Sheriff's leave policies are

inconsistent with § 124.38, she has brought no such claim, and the Court will not entertain such an argument.

Turning to Ms. Lowes's factual allegations, first she insists that she should have accrued an additional 4.6 hours of sick leave after the close of the pay period ending on April 16, 2017, while the Sheriff insists that leave is not accrued until the pay date after the close of the pay period—in this case, April 28, 2017. Ms. Lowes is wrong. Section 3.5 of the Sick Leave Policy explicitly says that available sick leave is calculated *using the amount reported on the most recent pay stub*. That necessarily means that an employee's leave total could *not* include hours accrued after the issuance of her last paycheck (i.e., those accruing in the next pay period). Ms. Lowes acknowledges that she calculated her leave differently—and incorrectly. (Lowes Dep. 201:19–23 ("I looked at my previous pay stub and it had an adequate amount of leave on there. Also [sic] knew that we just finished a pay period and I had that earned leave also [sic] that wasn't on the pay stub.").)

Second, Ms. Lowes argues that the Sheriff improperly calculated her leave by failing to deduct the sixteen hours of leave she took on April 10 and 11 from her leave total prior to including her leave calculation on her April 14 paycheck. This is belied by the paycheck itself, which explicitly says that it encompasses March 20, 2017, through April 2, 2017, pay period. That obviously would not include April 10 or 11 or any leave taken on those days. This is precisely why Section 3.5 of the Sick Leave Policy provides that sick leave is calculated using the amount reported on the most recent pay stub *less any subsequent leave use*.

Third, Ms. Lowes argues that even though she had exhausted her FMLA leave, because the Sick Leave Policy and the FOP CBA only say that the "condition" must qualify under the FMLA, not that the leave must qualify, she did not violate the Sick Leave Policy. (ECF No. 47,

at 2–3.) This argument is spurious. One of the qualifying conditions of the FMLA is that an employee must have worked 1,250 hours during the prior twelve months. *Saulsberry v. Fed. Express Corp.*, 552 F. App'x 424, 429 (6th Cir. 2014). Accordingly, even if Ms. Lowes could have potentially taken FMLA leave on account of her condition, she was still ineligible under the FMLA because she had not worked sufficient hours. As a result, under the Sheriff's policies, she was ineligible to fall within the policies' references to the FMLA.

The Court acknowledges that Ms. Lowes's reading of the Sheriff's Sick Leave Policy is a possible one and that the FCSO could have written its policy more clearly. But Ms. Lowes offers no evidence that the Sick Leave Policy has ever been applied in the manner in which she interprets it, and she is not entitled to derive her own idiosyncratic interpretations of the Sheriff's policies for her benefit. Ms. Lowes's identification of an ambiguity with no factual support for her interpretation is not enough to create a genuine dispute of material fact sufficient to stave off summary judgment.

For purposes of summary judgment, the Court assumes that Ms. Lowes genuinely held each of these three beliefs, even though they are incorrect under the Sheriff's policies and the law. This does not matter. The Sheriff's policies and the LCA do not provide for genuine mistakes, however reasonable they might be. Ms. Lowes had violated the Sick Leave Policy eight times before, and on her ninth time—her literal last chance—the Sheriff was within his rights to terminate her. Pointedly, it is not a defense that Ms. Lowes violated the Sick Leave Policy because she was absent due to her disability. *See Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 742 (6th Cir. 2015) ("[EEOC] Guidance specifies that 'if an employee states that her disability is the cause of the conduct problem or requests an accommodation, the employer may still discipline the employee for the misconduct.'" (quoting "The Americans with

Disabilities Act: Applying Performance and Conduct Standards to Employees with Disabilities," 2008 WL 4786697, at *12 (Sept. 25, 2008))); *Rodgers v. Fed. Express Corp.*, No. 94-3776, 1996 WL 112574, at *2 (6th Cir. Mar. 13, 1996) ("If, however, a handicapped individual fails to fulfill all the requirements of his job or engages in misconduct, the employer has 'just cause' to discharge the employee without consideration of whether there is a 'reasonable accommodation' that can be made for plaintiff."); *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1316 (10th Cir. 2017) ("The ADAAA does not require employers to reasonably accommodate an employee's disability by overlooking past misconduct—irrespective of whether the misconduct resulted from the employee's disability.").

The Sheriff determined that Ms. Lowes's ninth leave violation was severe enough to warrant termination, and it is not this Court's role to second-guess that decision. The role of this Court is to assess whether Sheriff Baldwin illegally discriminated against Ms. Lowes, not whether the Sheriff made the best decision or the correct decision or even a fair decision. It is not this Court's job to "sit as a 'super-personnel department,' second-guessing management decisions." *Hardesty v. Kroger Co.*, 758 F. App'x 490, 496 (6th Cir. 2019) (quoting *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 960 (8th Cir. 1995)). Ms. Lowes was given eight chances to correct her attendance problem. "The ADA does not give her a [ninth] try." *See Ford*, 782 F.3d at 763; *Yellow Freight*, 253 F.3d at 950 ("The unchallenged record in this case reflects that Yellow Freight bent over backwards to accommodate Nicosia in spite of his long history of poor work attendance. Nicosia was repeatedly warned and reprimanded, and given numerous opportunities to improve his work attendance record. It was Nicosia's woeful attendance record that forced Yellow Freight into the position that it could no longer justify Nicosia's employment.").

Defendant's Motion for Summary Judgment as to Counts One through Six is

**GRANTED**.

IV.     **CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment is

**GRANTED** as to Counts One through Six and **DENIED** as moot as to Count Seven. Count

Seven is **DISMISSED** without prejudice for lack of jurisdiction.

**IT IS SO ORDERED**.


/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**